Filed 9/15/14  In re L.W. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re L.W., a Person Coming Under the Juvenile Court Law. | B252903 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK99610) |
| Plaintiff and Respondent, | |
| v. | |
| GEORGIA S., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County. Debra Losnick, Commissioner.  Affirmed.

Kate M. Chandler, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

_____

Georgia S., mother, appeals from the juvenile court's order asserting dependency jurisdiction over her daughter, L.W., and the disposition order awarding father Mark W. sole legal and physical custody and granting mother only monitored visitation. The juvenile court found true allegations that mother emotionally abused L.W. by coaching her to falsely accuse father's girlfriend of sexual abuse and by "enmeshing" L.W. in mother's conflicts with father. Mother contends substantial evidence did not support the jurisdiction and disposition orders. Mother further contends the juvenile court prejudicially erred in excluding evidence based on the psychotherapist-patient privilege and hearsay. We affirm the juvenile court orders.

## FACTUAL AND PROCEDURAL BACKGROUND

Five-year-old L.W. first came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in February 2013. Mother reported to DCFS that L.W. had witnessed domestic violence between mother and father when they were still together; they had been separated since March 2011. Mother explained a restraining order she had obtained against father would soon expire. Mother said she secured the restraining order after father threatened her in L.W.'s presence. The detention report recounted: "It was reported that the child had free visitation with father before the incident occurred however the referral stated that child told mother she is afraid of father because child told mother that the father would not feed her when child was visiting father. In addition, mother reported that father has left child alone in the car when child was with father, however it was noted that the reporter has no information regarding when this occurred, how many times it occurred or when it occurred. The referral stated that the mother stated that she was afraid when the restraining order expires that child would have to visit with the father." DCFS closed the referral as unfounded.

### The Initial Detention, Detention Report and Dependency Petition

In April 2013, DCFS received another referral which was reported as follows: " '[T]he caller reports that child told mother that her father's girlfriend poked her in her belly button, her vagina and rubbed her breasts (chest).' " A case social worker spoke

2

with father.  He denied any abuse or neglect and said L.W. had not told him of any abuse by his girlfriend.  The social worker next met with mother and L.W.  Before the social worker took L.W. to an interview room to speak with her alone, mother told L.W. to tell the truth and to tell the social worker everything she had told mother.  According to the social worker, L.W. was clean, well-groomed, appropriately dressed, and had no visible marks or bruises.  However, the social worker observed L.W. was "quiet and withdrawn," and she was "not as outgoing as she was when [the social worker] first met [her] during the prior referral investigation" in February.  L.W. told the social worker that when she was taking a bath at father's girlfriend's house with the girlfriend's two children, the girlfriend touched her.  Upon further questioning, L.W. told the social worker the girlfriend had washed her stomach and chest after she got applesauce on her body, and the girlfriend used soap and a sponge.  L.W. denied being scared during the bath or after, and she said she felt safe with mother, father, and father's girlfriend.  At that point, L.W. said she did not want to answer any more questions.  She told the social worker: " 'Mommy asks a lot of questions.' "  When the social worker asked what kind of questions, L.W. replied: " 'Mommy tells me to say things. . . . Mommy says bad things about daddy.' "  L.W. "denied all forms of abuse/neglect."

The social worker noted that in February 2013, she had observed that mother discussed father, and her allegations against father, in front of L.W.  In the April 2013 discussion with the social worker, mother reported L.W. said father's girlfriend poked her in the stomach and touched her chest and vagina.  Mother asked L.W. if the girlfriend had poked her on the inside of the vagina, and L.W. said yes.  Mother said L.W. was not sleeping and went to mother's bed at night because she was afraid.  Mother asked if L.W. told the social worker about "the 'sexual abuse.' "  When the social worker indicated L.W. had not provided the same information as the referral, mother said L.W. was afraid because father told her not to tell anyone.

3

Father's girlfriend denied the allegations and denied that L.W. even had a bath at her house. According to the girlfriend, L.W. said, " 'It's all my fault. Mommy is telling everyone that [girlfriend] gave me a bath,' " and, " 'Mommy is trying to make me say bad things about Daddy to the police.' "

The social worker spoke with L.W.'s therapist, Cynthia Della Ripa. The detention report recounted: "[Ripa] reported that child is showing anxiety in the presence of Mother. [Ripa] stated that child has not disclosed any abuse or neglect. [Ripa] stated mother continues to want to be in the sessions with [L.W.]. [Ripa] reported that mother does not understand that play therapy is appropriate as mother wants to know what child discloses in the therapy session. [Ripa] has concerns for child's emotional well being for child as child is being put in the middle." The report later quoted Ripa as stating: " 'Child did not disclose sexual abuse to me. I have observed child demonstrating separation anxiety and attachment issues during play therapy.' "

Around 10 days after the April referral, mother called the social worker, and, according to the detention report, demanded to know why father's girlfriend, who she described as a "sexual predator," was allowed to have contact with L.W. Mother suggested the social worker was not doing her job in keeping L.W. safe from the girlfriend, and "wanted to know what the police were doing and how come the police had not taken her child for a 'rape exam.' " Mother told the social worker she had called the police but was told they were not investigating because no crime had been committed. Mother asserted that because of the social worker it was now too late for L.W. to have a rape exam. Mother subsequently called the social worker's supervisor and claimed the social worker was not doing a "proper job," thus L.W. could not be examined for "sexual abuse evidence." Mother threatened to file a complaint against the social worker.

DCFS arranged an informal meeting with mother and father to determine if they could reach an agreement "to stop any future chance of emotional abuse" of L.W. Although mother agreed to attend, on May 1, the day of the meeting, mother informed the social worker by telephone that she was at the North Hollywood police station making a report of sexual abuse. Mother said "she did not understand why the police station would

4

not take the report even though she had tried several times to make a report of sexual abuse against [father's girlfriend]. Mother reported that she would stay at the police station and wait until someone took the report." L.W. was with mother. Police later told the social worker a report had been taken and L.W. was being interviewed. A police officer told the social worker a report was filed after mother said there was penetration. The officer also told the social worker that mother had tried "numerous times" to file a police report but "one was not taken as the allegations from mother appeared to be a bathing issue rather than sexual abuse." Father and his girlfriend went to the police station after the meeting with DCFS. A law enforcement officer subsequently told the social worker father and the girlfriend were interviewed and "no charges were pressed."

During the meeting mother missed, father and his girlfriend claimed L.W. had not taken a bath at the girlfriend's house. Father asserted mother made false allegations because she was "unable to move on with her life," and could not accept she and father would not get back together. He indicated mother had secured a temporary restraining order against him, but when they went to family court the order was "thrown out." Father also said mother brought L.W. to court and "tried to get the judge to allow [L.W.] to make a statement against father."

Later in May, the social worker spoke with a detective investigating the sexual abuse allegations. The detective said that although at first it seemed the investigation would be concluded quickly because the conduct appeared to be appropriate, mother later said there was " 'digital penetration to rectum and vagina,' " so L.W. and mother would have to be re-interviewed. The detention report did not indicate whether another interview in fact took place.

On May 10, father reported an incident to DCFS that had occurred at L.W.'s preschool. According to father, at L.W.'s request he attended a Mother's Day Tea at the school, to which all parents and families had been invited. When mother arrived she was displeased that father was there because she felt it was "her day." Mother told father: "Give me my fucking child you child molester, or I will call the police." A few days later, the director of the preschool largely confirmed father's account to the social

5

worker.  The director said that after mother's outburst, L.W. was "hysterically crying." The next school day, L.W. repeated mother's statement—"give me my fucking daughter"— to the school director.  When the director asked L.W. how "that made her feel," L.W. responded "it made her feel sad."  The detention report indicated the director "stated that this is affecting the child.  [The director] reported that [L.W.'s] behavior has changed in school.  Child is acting out by being defiant and not listening at school. . . . [L.W.] told [the director,] 'The court says I can only spend one night at my [Dad's].' [The director] believes that child is being told what to say or hearing [mother] talk about the situation. . . . [The director] reported that child has told her numerous times that mother goes to court a lot."

The director also told the social worker L.W. cried because she wanted to be with father.  She said mother had approached her on "a few separate occasions" to encourage L.W. to tell the director or other teachers " 'what is going on at home and if she is scared of anything.' "  Mother then added as an aside to the director, " ' because I know you are a mandate[d] reporter.' "  The director further reported mother had at times tried to get the school not to release L.W. to father.  She opined: " '[L.W.] is caught in the middle and [is] being used as a pawn by mother.' "

According to the social worker, at a May 16 team decision meeting, mother accused father's girlfriend's nine-year-old daughter of " 'digitally penetrating [L.W.'s] rectum and vagina.' "[1]  Father said mother told L.W. that father was dead and this made L.W. "sad and depressed."  When the supervising social worker "confronted" mother with this claim, "mother did not deny the allegation."  After the meeting, L.W. was to have a weekend visit with father.  Mother called the social worker and asked to whom

---

[1]     On May 13, 2013, the family law court issued written findings and an order in a custody matter between mother and father, following a March 6, 2013 hearing.  The court denied mother's request for temporary restraining orders.  It awarded the parents joint legal custody.  The court ordered shared physical custody, with father to have L.W. three weekday evenings, every weekend, and alternating holidays.

L.W. should report any new allegations. Mother said she was concerned " 'because things could have happened over the weekend while child was in father's care.' "

DCFS detained L.W. from mother and released her to father. On May 23, DCFS filed a dependency petition alleging jurisdiction under Welfare and Institutions Code section 300, subdivision (c).**2** The petition alleged mother emotionally abused L.W. by forcing her to provide "false and misleading information of sexual abuse" by father's girlfriend, "resulting in repeated interviews of the child by DCFS and law enforcement." The petition further alleged mother "made disparaging remarks" about father to L.W., and mother "enmeshed" L.W. in mother's conflicts with father. The petition asserted: "The mother's emotional abuse of the child has resulted in the child demonstrating anxiety and emotional distress requiring psychological therapeutic services. Such emotional abuse of the child on the part of the mother places the child at substantial risk of suffering serious emotional damage as evidenced by severe anxiety, depression, withdrawal and aggressive behavior toward herself or others."

In the accompanying detention report, DCFS summarized its reasoning for recommending continued detention:

> "DCFS is under the impression that mother is making false allegations against the father in order to alienate child from her father. It appears that mother is coaching the child to make false statements in an effort to alienate the child from her father. Mother continues to increase the intensity of allegations when she does not get the response that she desires. She has brought her concerns to mandated reporters, therapists, teachers, law enforcement[,] family court and DCFS and none of the agencies have taken any action against the father because they believe that the allegations are false. . . . During the investigation and subsequent TDM, it became apparent that mother has the intention of making further allegations so that a child abuse report would be generated. Mother indicated that the previous day she disclosed to a licensed therapist at an intake interview that there was history of domestic violence between her and father and child [L.W.] was a witness to it. Mother informed [the social worker] that the counselor indicated that a child abuse report would be generated and child

---

**2**     All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

would need to be interviewed again.  Mother was adamant about making calls until someone starts listening to her 'cry for help.' "

The juvenile court detained L.W.

*Jurisdiction and Disposition Report*

The jurisdiction and disposition report repeated much of the information contained in the detention report.  In an interview for the report, father told DCFS his relationship with mother began to deteriorate when he informed her he had a new girlfriend.  At that point mother told the preschool that L.W.'s last name had been changed so that she no longer had father's last name.  Mother also began alleging father had engaged in domestic violence against her, and she sought a temporary restraining order.  Father denied any domestic violence.  Father also again denied that his girlfriend gave L.W. a bath, and indicated mother had previously falsely alleged he left L.W. alone in a car.

The report recounted additional information from the preschool director, including that she "noticed that [L.W.] now has become more angry and aggressive toward other children, also reacting to them and telling on each other."  The director stated she never suspected any abuse, or had any concerns about "any abuse issues."  However, mother had on one occasion told the director "somebody had been touching her daughter and then she [mother] became really emotional."

*Jurisdiction and Disposition Hearing*

The jurisdiction and disposition hearing was conducted over several days between June and October 2013.  In the midst of the jurisdiction hearing, DCFS requested that the court order mother not to contact L.W.'s school.  DCFS reported father had enrolled L.W. in a magnet school.  A school administrator told a DCFS social worker that mother called the school five times in one day in an attempt to confirm that L.W. was enrolled at the school.  The administrator said mother originally called the school and stated she had received a call from the office stating L.W. was missing, so mother wanted to confirm that L.W. was in fact at school.  Mother asked for a meeting with the principal "to explain how her daughter had been taken away from her by the father and that her rights were being violated."  The administrator indicated mother called 15 to 20 times the next day.

8

L.W. was briefly disenrolled from the school because staff were concerned the school was not L.W.'s "home school," and felt mother was a threat to the office staff and other students. The court ordered mother not to have any further contact with the school.

At the hearing, Mother testified she had concerns that L.W. had been touched inappropriately because of what L.W. had told her; she indicated she did not know if it was sexual abuse or not. According to mother, on April 15, L.W. first volunteered that father's girlfriend gave her a bath. Mother told L.W. she did not want her naked in front of other people, and father should have given her a bath. Mother called father later that day. He said L.W. was lying, there was no bath, but then said L.W. took a bath with the girlfriend's daughters. A few days later L.W. brought up the bath again. L.W. told mother she did not like it when the girlfriend gave her a bath and poked her belly button. Mother demonstrated from the witness stand how L.W. reenacted the belly button poking. Later that evening, L.W. brought up the incident again and said she did not like it when the girlfriend "does this," which mother demonstrated was a crotch grabbing motion, repeated three times.

Mother testified she took L.W. to a therapy appointment the next day and told Ripa what L.W. had said. As mother recounted and demonstrated at the hearing, in response to Ripa's questions, L.W. indicated with gestures that the girlfriend made an "upward motion from the crotch along side to about the stomach, middle," which L.W. said hurt. L.W. also showed the therapist that the girlfriend grabbed at L.W.'s chest. L.W. said father told her to tell mother there was no bath, and to "play a trick" on mother to make her happy.

According to mother, Ripa suggested mother talk to the police about what L.W. had disclosed. Mother said she made only one report to the police about L.W. suffering some type of harm while in father's care. She denied making any complaints to DCFS and denied ever calling the child abuse hotline. She admitted she let L.W.'s preschool know that an investigation was taking place, but denied encouraging L.W. to tell the preschool teachers "what is going on." Mother testified L.W. was interviewed only twice about the allegations: by the DCFS social worker and once at the police station. She said

9

she took L.W. to the courthouse on the day of the restraining order hearing on the advice of her attorney who suggested L.W. might be called as a witness, and because she had no other childcare arrangements.

Mother denied speaking about father in a negative manner in front of L.W. However, mother admitted the Mother's Day Tea incident at the preschool.[3] She asserted she only spoke after father, who was holding L.W., refused to let her go as mother was trying to leave. Mother acknowledged she had been inappropriate on that occasion, but also said she spoke in a whispered or hushed tone and she did not believe L.W. heard her. She also admitted L.W. was crying during the incident, but she attributed the crying to L.W. not being ready to leave the party. She denied forcing L.W. to make false allegations of sexual abuse. Mother also denied calling the police and requesting that L.W. have a rape exam. She claimed many of the statements attributed to her in the detention report were taken out of context, were incorrect, or were false. She denied ever claiming father's girlfriend's daughter digitally penetrated L.W.

Mother testified she believed she had done the best she could and "reported what [she] was told." Mother explained: "But whether it's sexual abuse or not, that's out of my scope as a parent. I don't know. That's for DCFS or authorities whether it is law enforcement to decide on that or the therapist." Mother testified she first took L.W. to a therapist in March 2013 because L.W. was having difficulty with mother and father's separation.

A police officer who interviewed L.W. testified L.W. told the officers father's girlfriend: " 'rubbed my pee-pee'. . . . 'I said stop,' and she said 'okay.' And then [the girlfriend] said, 'I am sorry.' . . . . '[The girlfriend] 'told me she was sorry for washing my pee-pee.' " The officer further testified that L.W. told the officers the girlfriend had touched L.W.'s "breasts" or "nipples," with what the officer described as a "slight

---

[3]    Although mother initially testified she said something to the effect of "give me my fucking child, you child molester," she later testified she said, "give me my fucking daughter, or I will call the police," and indicated she did not recall calling father a child molester.

10

twisting motion." The officer did not think L.W. had been coached. He said L.W. seemed angry during the interview, but he could not tell at whom the anger was directed or the source.

*Therapist Testimony Issues*

When mother's counsel called Ripa as a witness, L.W.'s counsel informed the court she would not waive the psychotherapist-patient privilege and was prepared to object on those grounds. Mother's counsel argued the privilege had already been waived because Ripa was quoted in the detention and jurisdiction reports, and no one had objected to those statements being considered at the detention hearing. The court disagreed. Ripa's counsel further indicated Ripa would not be authorized to testify regarding any child abuse reports unless ordered to do so, pursuant to Penal Code section 11167.5.[4]

Ripa testified that before May 23, the day the dependency petition was filed, she never suspected mother was emotionally abusing L.W. Mother's counsel asked Ripa if she ever called the DCFS hotline and reported that L.W. was sexually abused. The court sustained objections by counsel for DCFS and L.W. on the ground the information was "confidential."[5] Ripa testified mother told her L.W. had shared "some information with her that she [mother] was concerned about and was hoping [L.W.] can share with me in session." She did not recall if mother used the term "sexual abuse." The court sustained L.W.'s counsel's privilege objection to the question of whether Ripa discussed possible sexual abuse with L.W. The court also sustained objections to the questions: Did Ripa inform mother by text that she [Ripa] had reported possible sexual abuse to the DCFS

---

[4]     Under Penal Code sections 11167.5 and 11167, reports made by statutorily mandated reporters, and the identity of a person making such a report, are confidential and may be disclosed only under limited circumstances.

[5]     However, Ripa was allowed to testify as to whether she had ever called the DCFS hotline in *any* case. Her answer was, "not that I recall." The juvenile court sustained an objection to mother's counsel's question attempting to clarify whether her answer included this case.

11

hotline; did sexual abuse come out in any type of therapy; was it accurate to state that Ripa told the social worker in May 2013 that L.W. disclosed sexual abuse to her [Ripa]; and did Ripa recall what she discussed with the DCFS social worker.[6]

Ripa testified she did not make the statement attributed to her in the detention report that "child did not disclose sexual abuse to me." Instead she was asked if sexual abuse came out during play therapy, and Ripa responded that it did not; what came out of play therapy was separation anxiety. Ripa never saw any conduct by mother she thought was inappropriate. She recalled that in April, L.W. disclosed "some information about being touched inappropriately."[7] Ripa opined mother's anxiety over the custody dispute with father had affected L.W. "a little bit." However she never witnessed any psychological or emotional abuse by mother. She had not come to the conclusion that mother had psychologically or emotionally abused L.W. She opined that L.W.'s relationship with mother had overall been positive. She observed L.W. display some anxiety in play therapy, which she thought was "a result of the anxiety she feels as a result of the relationship between her mother and father."

The social worker who wrote the jurisdiction and disposition report testified she talked with Ripa about the case in general, but only after she wrote the report. When asked whether Ripa told the social worker she was the reporting party to DCFS about the sexual abuse allegation, counsel for DCFS objected the information was confidential. The court sustained the objection. The court also sustained hearsay objections to the questions: "What did [Ripa] tell you about the case?" and "Did [Ripa] tell you anything . . . that would be exculpatory for my client?" The social worker testified Ripa said L.W. reported "some type of abuse" by father's girlfriend.

---

[6] The court also sustained Evidence Code section 352 or hearsay objections to questions about when father consented to have Ripa treat L.W., and what Ripa told father about why mother sought counseling for L.W.

[7] Ripa provided this testimony in response to questioning from L.W.'s counsel. When mother's counsel attempted to ask follow up questions on redirect, the court sustained objections to the questions.

*Juvenile Court Ruling*

After the evidence was submitted, the juvenile court concluded there was "plenty of evidence that this child is acting in an untoward fashion. She's changed her behavior. The mother has gone to . . . the police a number of times, the school a number of times, back to the police, and anyone else, frankly, that will listen, including the Department, to try and show that somehow this is a bad dad, and he is hurting her child or his girlfriend when it didn't work with the father. Frankly, the only one hurting the child is the mother." The court described mother's testimony as "incredible to me, and I don't believe that in a positive way." The court further stated it had "absolutely no doubt" that the section 300, subdivision (c) allegation was true by a preponderance of the evidence. The court declared L.W. a dependent of the court under section 300, subdivision (c), then terminated jurisdiction with an order awarding father sole legal and physical custody. The court ordered a minimum of five hours per week of monitored visitation for mother. Mother's appeal followed.

## DISCUSSION

### I. Substantial Evidence Supported the Jurisdiction Order

Mother contends there was insufficient evidence for the juvenile court to find L.W. was a person described by section 300, subdivision (c). We disagree.

"We affirm a juvenile court's jurisdictional and dispositional findings if they are supported by substantial evidence. [Citation.] 'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citation.]" (*In re A.J.* (2011) 197 Cal.App.4th 1095, 1103 (*A.J.*).)

Under section 300, subdivision (c), the juvenile court may assert dependency jurisdiction over a child when "the child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result

13

of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care." "In a situation involving parental 'fault,' the petitioner must prove three things: (1) the offending parental conduct; (2) causation; and (3) serious emotional harm or the risk thereof, as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior." (*In re Alexander K.* (1993) 14 Cal.App.4th 549, 557.)

There was substantial evidence that mother's conduct placed L.W. at substantial risk of suffering serious emotional harm. Even before the bath incident with father's girlfriend, mother had involved L.W. in the custody dispute with father. Mother told DCFS she feared for L.W. to visit with father once a restraining order expired; DCFS concluded the referral was unfounded. Mother's request for a restraining order against father was denied after a hearing, but mother admitted she was prepared to make L.W. available as a witness in the custody matter. Mother encouraged L.W. to confide in her teachers, and, without any apparent basis, suggested to the teachers that L.W. might reveal something to them they would be required to report as mandated reporters. Mother tried to get the preschool not to release L.W. to father, and, according to father, mother falsely told the school L.W.'s name had changed so that she no longer had father's last name.

Once the bath incident took place, there was evidence mother's response was, or became, entirely disproportionate to the alleged conduct. According to mother, after L.W. first disclosed inappropriate touching, she had L.W. disclose this information to her therapist, Ripa. Once a corresponding DCFS referral was generated, and L.W. was interviewed, L.W. did not describe inappropriate touching to the social worker. Yet, mother did not let the matter rest. Instead, mother subsequently described father's girlfriend to DCFS as a "sexual predator," and blamed police and DCFS for failing to seek out or conduct a "rape exam."

Despite the ongoing DCFS investigation and L.W.'s failure to describe inappropriate touching to DCFS, mother subsequently filed a police report. A police officer told DCFS that mother tried numerous times to file a report but it was not taken.

14

At that point the allegations of inappropriate touching for the first time included rectal and vaginal digital penetration. Mother told L.W.'s preschool director there had been inappropriate touching. After losing her temper, mother called father a "child molester" in the presence of L.W. and others. There was evidence mother told L.W. father was dead. Even after DCFS was involved, and L.W. was to spend a weekend with father pursuant to the custody order, mother asked DCFS how L.W. should report any new allegations, suggesting mother anticipated there would be additional claims to report, despite the absence of problems or cause for concern before the bath incident. When mother testified at the jurisdiction hearing, she denied many of the troubling statements attributed to her in the detention report. However, the juvenile court did not find her testimony credible.

L.W. told the social worker that mother asked a lot of questions, said bad things about father, and mother told her to "say things." In context, it is reasonable to infer that L.W. meant mother told her to say negative things related to father. According to father's girlfriend, L.W. said mother was trying to make her say bad things about father to the police. Father reported mother's comments that he was dead made L.W. sad and depressed. The preschool director said L.W. had become angry and aggressive toward other children "since all of this started."

Thus, there was substantial evidence mother attempted to coerce L.W. into making statements to authorities that were either false or exaggerated. There was also evidence that, rather than shielding L.W. from the parental discord, mother repeatedly exposed her to it. There was evidence that L.W. was already experiencing negative behavioral changes as a result. The trial court could reasonably conclude mother's harmful coaching and exaggeration placed L.W. at substantial risk of suffering serious emotional damage. (See *In re Christopher C.* (2010) 182 Cal.App.4th 73, 84-85 (*Christopher C.*) [substantial evidence of risk of substantial emotional harm where parents coached children to make allegations of sexual abuse and used them as "weapons in an ongoing familial fight"].)

The relevant caselaw applying section 300, subdivision (c) does not mandate a different result. For example, in *In re Alexander K., supra*, while there was evidence the

child displayed emotionally troubled behavior (*id.* at pp. 552-553, 554), the Court of Appeal concluded the record lacked any evidence the child's behavior was the result of the father's conduct. (*Id.* at p. 559.) There was no evidence the father engaged in any abusive behavior. In contrast, here there was evidence that mother's conduct was harmful to L.W. and placed her at risk of harm. Causation was established in this case.

This case is more similar to *A.J.* In *A.J.*, there were child abuse referrals made alleging the father pushed the mother out of a moving car while the child was in the car, and that the father had abducted the child. The mother also told a social worker the father raped and molested the child. The reports were shown to be false. (*A.J.,* at pp. 1097-1098.) The child told a social worker her parents argued and the mother usually started the argument, but she denied that the parents engaged in any physical violence. The child also told the social worker she heard the mother threaten to get the father in trouble by making false allegations against him. (*Id.* at p. 1098.) The mother's family described her as unstable. (*Id.* at pp. 1099-1100.)

Before the jurisdiction hearing took place, the mother left disparaging messages on the father's cell phone and threatened to call the police and have him arrested. (*A.J.,* at p. 1101.) The mother later obtained a temporary restraining order from the family court that denied the father any visitation with the child. The mother then attempted to have the police remove the child from the father's home. The child told police the mother was not supposed to be at the father's house, and she did not want to go with the mother. As a result of the incident, the child suffered several nightmares, was afraid of the mother, and refused to visit her. (*Id.* at pp. 1101-1102.) The juvenile court declared the child a dependent child, then terminated jurisdiction with an award of sole physical custody to the father, joint legal custody, and monitored visits for the mother.

On appeal, the reviewing court found substantial evidence supported jurisdiction under section 300, subdivision (c). The court noted the child experienced severe anxiety and emotional damage because of the mother's conduct, illustrated by her nightmares, fear of the mother, and her belief that the mother was crazy. (*A.J.,* at p. 1104.) The court further concluded the evidence established the child was at substantial risk of suffering

16

serious emotional damage from the mother's abusive conduct, including her repeated false accusations against the father, some of which the child heard, her disparaging comments about the father, and the mother's attempt to have the police remove the child from the father's custody under false pretenses. (*Id.* at p. 1104.) The court explained that unlike the parents in *In re Brison C.* (2000) 81 Cal.App.4th 1373 (*Brison C.*), the mother had never recognized her inappropriate behavior or expressed a willingness to change.[8] (*A.J.*, *supra*, at pp. 1105-1106; see also *Christopher C., supra,* 182 Cal.App.4th at p. 85 [distinguishing *Brison C.* on ground that parents had ignored the substantial risk of emotional damage to children caused by their conduct].) Dependency jurisdiction and removal were appropriate.

We recognize the facts of *A.J.* are more extreme than those presented in this case. Still, we find the *A.J.* court's reasoning instructive. As in *A.J.*, here mother either falsified or significantly exaggerated alleged misconduct on the part of father's girlfriend and initiated a chain of events that resulted in L.W. having to repeat the details of the bath incident multiple times. Mother expressed her discord with father in L.W.'s presence and involved her in that conflict by, in L.W.'s own words, trying to make her say bad things about father. Although L.W. had not experienced nightmares like the child in *A.J.*, she expressed sadness to father about mother's comments, the preschool director noted a negative change in L.W.'s behavior, and L.W. reacted to mother's outburst at the preschool with hysterical crying, according to one account. Further, as in *A.J.,* and unlike the parents in *Brison C.*, mother did not recognize her inappropriate behavior or express a willingness to change. As in *A.J.*, the juvenile court could find,

---

[8] The *A.J.* court also questioned the soundness of the conclusion in *Brison C.* that the child displayed no signs of emotional damage. The *A.J.* court noted the child in *Brison C.* "feared his father, had suicidal ideation if forced to visit or live with him, and suffered nightmares. [Citation.] The conflict between his parents caused him 'upset, confusion and gastrointestinal distress.' [Citation.]" (*A.J.,* at pp. 1105-1106.) However, the court in *A.J.* was not required to expressly disagree with *Brison C.* due to the factual differences between the two cases, as explained above. (*A.J.*, at p. 1106.)

based on the evidence, that mother's conduct placed L.W. at substantial risk of serious emotional harm.

Likewise, in *In re Matthew S.* (1996) 41 Cal.App.4th 1311, the appellate court found substantial evidence supported a finding that the mother's violent delusions involving her son placed him at substantial risk of suffering serious emotional damage, even though he had not yet been harmed. The mother had delusions that the child's penis had been mutilated and that she murdered the treating physician when she found her son in a septic state at the hospital. Acting on these delusions, the mother took the child for a urological examination. On another occasion, she pulled down his pants to make sure his genitals were intact. (*Id.* at p. 1314.) The court explained the mother brought "a foreboding sense of dread, danger and catastrophe to the lives of her children." (*Id.* at p. 1320.) Although the child had been able to cope with the delusions, the court noted he was confused by them, and did not speak up out of fear of aggravating the mother's condition. Because the mother forced him to undergo an embarrassing and invasive examination as a response to her delusions, the son suffered "the indignity and embarrassment of the medical examination." (*Id.* at p. 1321.) The court noted that the child's reluctance to talk about his feelings or seek out assistance reflected "withdrawal and it points to the need for court supervision." (*Ibid.*)

While in this case there is no evidence that mother is suffering extreme mental or emotional problems, the case is similar to *Matthew S.* in that mother sought an invasive and uncomfortable investigation of the bath incident, without it appearing to be warranted. While mother disputes the accuracy of the DCFS reports, there was evidence that mother expressed dismay at the lack of a forensic investigation, and that she persisted in seeking police involvement even after DCFS was already involved and the police initially declined to even accept a report. Further, mother displayed a pattern of involving L.W. in her conflict with father. L.W. volunteered to the social worker that mother asked a lot of questions, said bad things about father, and told L.W. to "say things." As in *Matthew S.*, the juvenile court could find that although L.W. had not as yet

18

suffered harm due to mother's conduct, substantial evidence indicated a substantial risk of future serious emotional harm.

We therefore affirm the juvenile court's jurisdiction order.

## II. Substantial Evidence Supported the Disposition Order

We also conclude substantial evidence supported the juvenile court's disposition order.

### A. Mother's Argument is Not Forfeited

As an initial matter, we reject DCFS's argument that mother forfeited a challenge to the disposition order by submitting on the juvenile court's tentative, thereby inviting any error. After the jurisdiction hearing, the court indicated it wished to proceed with disposition, however it understood that mother's counsel had argued mother was not given notice that DCFS would seek to close the case. The court said it would leave it up to mother's counsel to decide if he wished to set a separate disposition hearing. After a recess, the court asked mother's counsel how mother wished to proceed. At that point, mother's counsel said mother would submit on the court's tentative order. Under these circumstances, we disagree that the record suggests mother acquiesced in the juvenile court's order. Instead, the most reasonable interpretation is that mother agreed the court could proceed with disposition without further argument or a separate hearing.

While submitting on a social worker's recommendation may waive a parent's right to challenge a juvenile court decision accepting the recommendation (*In re N.S.* (2002) 97 Cal.App.4th 167, 170), in general "[s]ubmission on a tentative ruling is neutral; it conveys neither agreement nor disagreement with the analysis." (*Mundy v. Lenc* (2012) 203 Cal.App.4th 1401, 1406.) Moreover, "[a]lthough a parent who submits on a particular report or record acquiesces to the evidence, the parent preserves the right to challenge the sufficiency of the evidence to support a particular legal conclusion." (*In re N.S.*, at p. 170.) Thus, we consider the merits of mother's challenge to the court's disposition orders.

19

**B. Substantial Evidence Supported the Dispositional Order of Removal and Custody and Visitation Orders Upon Termination of Jurisdiction**

"On appeal from a dispositional order removing a child from a parent we apply the substantial evidence standard of review, keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence. [Citation.] [¶] Under section 361, subdivision (c)(1) children may not be removed from their home 'unless the juvenile court finds clear and convincing evidence' of a substantial danger to the children's physical health, safety, protection, or physical or emotional well-being 'and there are no reasonable means' for protecting the children other than removal from their home. The statute 'is clear and specific: Even though children may be dependents of the juvenile court, they shall not be removed from the home in which they are residing at the time of the petition unless there is clear and convincing evidence of a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being *and* there are no "reasonable means" by which the child can be protected without removal.' [Citation.]" (*In re Ashly F.* (2014) 225 Cal.App.4th 803, 809.) We review the court's custody and visitation orders issued upon termination of jurisdiction for abuse of discretion. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.)

Here, substantial evidence supported a finding that L.W. was at substantial risk of harm if returned home and there were no reasonable means to protect her without removal. The harm to L.W. arose out of mother's repeated efforts to generate the involvement of the authorities in her conflict with father, by using L.W. This began with the February referral made to DCFS on the eve of the expiration of a restraining order, and mother's handling of the bath incident. Irrespective of the source of the DCFS referral regarding the bath, mother appeared to exaggerate the significance of L.W.'s account of a bath by father's girlfriend, then mother repeatedly escalated the issue by asserting DCFS was not handling the matter as one dealing with a sexual predator, by insisting on filing a police report which required a police interview of L.W., and by further exaggerating or falsifying the claims to include "digital penetration" of multiple

orifices.  At one point when L.W. was visiting father before she was detained, mother appeared to be preparing for further reports to DCFS of alleged misconduct.  L.W. told the social worker mother asked a lot of questions, and tried to make her "say things." Before the conclusion of the jurisdiction hearing, the court entered a stay away order to keep mother from calling L.W.'s school, after she called at least 15 times to set up a meeting with the principal, causing the school to briefly disenroll L.W.  At the jurisdiction hearing, mother insisted she had acted appropriately with respect to the bath incident.  Mother admitted only that she had acted inappropriately at the Mother's Day tea at L.W.'s preschool.

On this evidence, the juvenile court could reasonably conclude removal was necessary to protect L.W.  Allowing L.W. to remain in mother's custody would have permitted mother to continue saying negative things about father, some of which had already significantly troubled L.W., and would have afforded her the opportunity to continue disrupting L.W.'s relationship and visitation with father by her questions and efforts to find misconduct where none existed.

In addition, the court did not abuse its discretion in awarding father sole custody and allowing mother only monitored visitation.  Mother had already engaged in obstructive conduct by calling L.W.'s new school, describing the custody dispute with father, and conducting herself in such a fashion that school staff felt she was a threat. Mother's conduct also suggested an inability to work cooperatively with father concerning L.W., which weighed against shared custody.  Moreover, the court could reasonably conclude monitored visitation was necessary to prevent mother from making further detrimental statements to L.W., or from attempting to question L.W. in an effort to find additional bases for alleging father or those associated with him had engaged in misconduct.

Mother's arguments on appeal regarding removal, the custody award, and monitored visitation, all center on her claim that the jurisdiction order was unsupported by the evidence, and there was no evidence she had done anything to put L.W. at risk of

harm. (§ 361, subd. (c)(1); *In re T.V.* (2013) 217 Cal.App.4th 126, 135 [jurisdictional findings are prima facie evidence the child cannot safely remain in the home].) In light of our conclusions above, we must reject these arguments.

## III. The Juvenile Court's Rulings Excluding Ripa's Testimony Were Not Reversible Error

Mother further asserts the juvenile court erred in excluding portions of Ripa's testimony. Mother contends: 1) the trial court erred in excluding evidence of Ripa's text message to mother because the message was neither a confidential communication nor hearsay; 2) the trial court erred in sustaining privilege objections to Ripa's testimony because L.W.'s counsel waived the privilege by failing to assert it early enough; 3) the privilege was not absolute and the trial court erred in not finding the necessity of the information outweighed the privilege; and 4) the "incomplete and patchwork nature" of the juvenile court's rulings made its actions arbitrary and capricious, and prejudiced mother because it prevented a "full picture of the nature and extent of [L.W.'s] psychological problems." Mother claims these errors cumulatively denied her a fair hearing and violated her right to due process.

We need not decide whether the trial court's evidentiary rulings were incorrect because we conclude that even if the court erred, any error was harmless under either a *Watson* or *Chapman* standard.[9] (Cal. Const., art. VI, § 13; *In re Jordan R.* (2012) 205 Cal.App.4th 111, 134-135; *In re Dolly D.* (1995) 41 Cal.App.4th 440, 446 [parent's inability to cross-examine social worker infringed on due process right to confront and cross-examine witnesses, was not harmless beyond a reasonable doubt]; *In re Ronald R.* (1995) 37 Cal.App.4th 1186, 1195 [violation of parent's statutory right to counsel reviewed under *Watson* standard].) Mother's theory below and on appeal, was that Ripa's testimony, if allowed, would reveal that Ripa called the DCFS hotline to report L.W.'s statements of abuse by father's girlfriend, and that mother both spoke about the

---

[9]   *People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24.

abuse with DCFS and reported it to the police at Ripa's suggestion. Mother has not established, however, that even if this were the substance of Ripa's testimony, it would have affected the ultimate outcome in this case.

The dependency petition alleged mother caused L.W. to provide false and misleading information of sexual abuse. Even if Ripa testified that L.W. disclosed sexual abuse and Ripa herself reported it to DCFS, then suggested that mother also contact police, this would not change the court's finding that L.W.'s initial report was coerced or coached by mother. It was undisputed that mother took L.W. to Ripa, and mother told L.W. to disclose the bath incident to Ripa. In addition, even if mother took L.W. to police at Ripa's suggestion, there was no indication that Ripa had any involvement in mother's subsequent conduct—repeatedly insisting police officers take a report after they declined, or the change in allegations from bath time touching to vaginal and rectal penetration which caused police to take a report and interview L.W.

Mother did not claim she was unaware of the alleged sexual abuse until L.W. reported it to Ripa. In light of the juvenile court's conclusion that mother, at the outset, caused L.W. to either falsify or exaggerate the bath touching, there is no basis for us to conclude the court's decision would have been in any way affected by testimony indicating mother was not the source of the referral to DCFS, or that Ripa suggested mother contact police.

Further, while the juvenile court sustained several objections to questions regarding the substance of L.W.'s therapy, Ripa was allowed to offer her observations or opinion of mother's conduct with L.W. Ripa testified she never saw any conduct by mother she thought was inappropriate. She said she never witnessed mother psychologically or emotionally abuse L.W., and had not come to the conclusion that mother psychologically or emotionally abused L.W. She opined that L.W.'s relationship with mother was, overall, positive. She did not attribute L.W.'s anxiety to mother's conduct or mention any severe harm to L.W.; instead she testified she thought mother's anxiety over the custody dispute affected L.W. "a little bit," and she thought L.W.'s anxiety was the result of "anxiety [L.W.] feels as a result of the relationship between her

23

mother and father." Though mother contends the trial court's evidentiary rulings improperly prevented her from presenting a complete picture of the extent of L.W.'s psychological problems, if any, what the court admitted on this subject was favorable to mother. Indeed, the juvenile court allowed Ripa's opinion on whether mother had emotionally abused L.W. Mother posed no other questions to Ripa regarding other psychological problems L.W. might have.

In view of the allegations in this case, the testimony mother sought to offer from Ripa was ultimately peripheral to the central issue. Even if the juvenile court's rulings were in error, we conclude they were harmless.

## DISPOSITION

The juvenile court orders are affirmed.


BIGELOW, P.J.

We concur:


FLIER, J.


GRIMES, J.


24